(108 App. Div. 24.)

## MENGIS v. FITZGERALD.

(Supreme Court, Appellate Division, Second Department.   October 20, 1905.)

1. BROKERS—CONTRACT FOR SERVICES—EVIDENCE.

    In an action for broker's services, evidence *held* insufficient to establish the making of a contract to pay plaintiff $1,000,000 for procuring and furnishing defendant data and valuable information relating to the prospective purchase of the securities and control of a certain railroad.

2. TRIAL—INSTRUCTIONS—APPLICATION TO PLEADINGS.

    Where plaintiff sued on an oral contract by which he claimed defendant agreed to pay him $1,000,000 for information and services relating to the prospective purchase of a railroad, in case defendant took part in the purchase, and in which he agreed not to go into it with anybody else unless he paid plaintiff $1,000,000, an instruction authorizing a recovery of "damages" for "breach" of such contract, consisting of defendant's taking part in an underwriting agreement for the purchase of the road in question and others, was not based on the cause of action pleaded, and was prejudicial error.

3. SAME—CURING ERROR.

    Where, in an action by a broker to recover contract compensation for services, the court erroneously charged that plaintiff was entitled to recover damages for defendant's "breach" of such contract, a subsequent statement by the court, as the result of a colloquy with counsel with reference to a request to charge, that plaintiff's contention was that defendant made an agreement that he would pay plaintiff $1,000,000 if he went into any arrangement to purchase the property with others, and he, having participated in a certain syndicate, therefore "became indebted to him in the sum of $1,000,000," was insufficient to cure the error.

4. BROKERS—CONTRACT FOR SERVICES—CONSTRUCTION.

    Where plaintiff alleged that defendant agreed to pay him $1,000,000 for information and services relating to the prospective purchase of a railroad, in case defendant purchased the same or became interested in its purchase with others, such contract could not be construed to restrain defendant from becoming interested in the purchase of such railroad for all time, on pain of being liable on the contract, but only bound him not to participate in the purchase for a reasonable time unless he paid plaintiff for his services.

5. SAME—ACTIONS—INSTRUCTIONS.

    Where, in an action for broker's services, plaintiff claimed that defendant agreed to pay him $1,000,000 in case he purchased a railroad which plaintiff was endeavoring to sell, or became interested therein, and plaintiff claimed that thereafter he did become interested by participating in a syndicate by which such railroad was consolidated with another, an instruction that plaintiff's contention was that defendant agreed to pay $1,000,000 if he went in with any one else in the purchase of the property, and that when he participated in the syndicate "he did go in with somebody else, and therefore became indebted to him in the sum of $1,000,000," was erroneous, in eliminating the question whether there was any connection between the transaction with the defendant and the purchase of the road by the syndicate, of which he afterwards became a member.

    Hirschberg, P. J., and Rich, J., dissenting.

Appeal from Trial Term, Kings County.

Action by Morris C. Mengis against Louis Fitzgerald. From a judgment in favor of plaintiff, and from an order denying defendant's motion for a new trial on the minutes, he appeals.   Reversed.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, RICH, and MILLER, JJ.

Elihu Root (William N. Dykman, on the brief), for appellant.

Thomas F. Magner (William H. Stryker and William F. Hagarty, on the brief), for respondent.

MILLER, J.　The plaintiff has recovered a verdict of $1,110,000 on an alleged contract made more than three years before the trial of the action, disputed by the defendant, evidenced by no writing, and established in its essential element, if at all, by the unsupported testimony of the plaintiff.　After a careful perusal of the record, I am unable to agree with the conclusion that the verdict is amply supported by the evidence, and that the record presents no errors prejudicial to the defendant.　The plaintiff pleaded an express contract to pay the stipulated sum of $1,000,000 for information and services, in the following language:

"That on or about and between the 1st day of January, 1901, and the 1st day of July, 1901, at the borough of Manhattan, city and state of New York, the plaintiff rendered certain services to the defendant, at his request, in procuring and furnishing to the said defendant certain data and valuable information relating to the prospective purchase of the securities and the control of a certain railway known as the Western Maryland Railroad Company, and for which said services in procuring said data and information the defendant promised and agreed to pay to the plaintiff the sum of one million ($1,000,000) dollars."

It is claimed that this contract is established by the testimony of the plaintiff, his then counsel, Mr. Lauterbach, and the secretary of the latter, Mr. Katz; the plaintiff and Mr. Katz testifying to the conversation at which the contract is claimed to have been made, and Mr. Lauterbach to a subsequent conversation with the defendant claimed to be confirmatory thereof.　It is so unusual for parties to trust the proof of contracts for the payment of so large amounts to the infirmities of both human memory and human nature, and it is so easy by the slightest changes to give conversations long past a meaning not contemplated by the parties at the time, that we analyze and scrutinize with care the testimony relied upon to establish such a contract.　For the purpose of comparison, I quote the part of the testimony of each of the plaintiff's witnesses relating definitely to the alleged contract.

By the plaintiff: "Said I: 'General, I want a more distinct understanding with you about these papers.　I can't get an option on that railroad or on these securities.　It is impossible for me to get an option.　I am not doubting your integrity at all; but I want it understood that if I leave with you these papers, or disclose the name of this railroad, I shall receive $1,000,000 from you when you acquire the securities or purchase the road, or any company that you might form, or any syndicate that you might form or become interested in—either one, company or syndicate—I shall receive $1,000,000 for my services and information to you.　I shall have to spend a great deal of time to aid you in the investigation.'　Gen. Fitzgerald said: 'Leave your papers.'　I am a little ahead of my story.　I said: 'General, I am only protecting myself.　I don't want you to go into it with any other company or body of men, because your name is a tower of strength.'　He says: 'You needn't be afraid.　If I don't go into it with you, I won't go into it with anybody else, unless I pay you the $1,000,000.' "

By Mr. Katz: "He [meaning the plaintiff] said in substance: 'Are you in a position to take up the underwriting of a bond issue of about $10,000,000 on a railroad proposition in the Middle States which I consider to be a great bargain?'　He mentioned the number of miles of the road and its

earning capacity, and the general said that if this thing was so good a thing he might not care to go into any underwriting. He might prefer to take up the whole thing himself. Mr. Mengis then told him that he wanted a distinct understanding before divulging the name of the road. Before that he said: 'In case I do take the thing up, what will you expect?' Mr. Mengis then said: 'I consider it a great bonanza,' or words to that effect. 'I want to make enough to retire for life. I want a million dollars out of it.' The general said, if the thing were what he represented, to bring in the papers and he would look into them; and that was practically what took place. By the Court: Q. Have you told all of the conversation? A. No; I did not recall it at the time, but I do recall more that took place at the time. Mr. Mengis then said, in addition to the remarks that were made: 'Now, I want it distinctly understood, general, that if you become interested in this thing, or any company or body of men or syndicate'—or things to that effect—'if you become interested in any of them that I am to be taken care of; and if you, after investigation, find that what I say is not true, and drop it, you will have nothing further to do with it of any character.' And Gen. Fitzgerald said: 'You can rest assured that, if I don't go into this thing with you, I will never have anything further to do with it.' "

By Mr. Lauterbach: "I then said to the general: 'General, if you don't do this transaction through Mr. Mengis, I want to exact a promise from you that you will not do it at all, either directly or indirectly.' Said he: 'Of course not. If I don't take the property through Mr. Mengis, I won't take any interest in it at all.' "

The testimony of the plaintiff does tend to establish a definite agreement of the defendant to pay $1,000,000, conditioned only on his becoming in any manner interested in the purchase of the road or the securities; but it is very difficult to spell such an agreement from the testimony of Katz. According to his testimony the defendant promised two things only: First, that he would look into the papers; and, second, if he did not go into the thing with the plaintiff, that he would have nothing further to do with it. His version of the transaction tends to indicate that it was the understanding of the parties that if, after investigation, the defendant concluded to go into the enterprise, he would do so with the plaintiff, the defendant to contribute the money and the plaintiff information and services to be valued at $1,000,000, and that, if he did not go in with the plaintiff, he would not lend his name and financial aid, which the plaintiff said was "a tower of strength," to any one else, thereby interfering with the consummation of the plaintiff's scheme through some other channel. This version is much the more reasonable of the two, and is confirmed by the testimony of Mr. Lauterbach and by subsequent events; and in considering the testimony of the latter it should be observed, not only that he was the plaintiff's counsel, actively assisting in the promotion of the enterprise, but that he also had a large pecuniary interest in its success, because thereby he hoped the plaintiff could realize money with which to repay him large loans, which the plaintiff had used in enterprises so unfortunate as to have reduced him to insolvency. It is fair to assume, therefore, that the plaintiff had carefully detailed to Mr. Lauterbach whatever agreement he then claimed to have with the defendant, and, if so, it is incomprehensible that Mr. Lauterbach would exact a promise that the defendant would not take any interest whatever in the property if he did not take it through the plaintiff, because, according to the latter, it was no concern to him how the defendant took an interest in it, as he was to be paid $1,000,000 in such

event; and it is difficult to harmonize an agreement to pay $1,000,000 conditioned upon doing a certain thing with a positive agreement not to do that thing. For a breach of the agreement, which the testimony of Mr. Lauterbach and of Mr. Katz tended to establish, if a breach was proven, the plaintiff could recover such damages only as he sustained; while on the contract, which his testimony tended to establish, he could recover the stipulated sum of $1,000,000 upon proof that the event, which was made a condition of such payment, had occurred—two very different causes of action.

It is fair to consider the nature of the information and services which were the consideration for the remarkable contract claimed by the plaintiff. The information was that the mayor of the city of Baltimore was resolved to sell the city's controlling interest in the Western Maryland Railroad; but this was no secret locked in the plaintiff's breast. It was public property, at least in the city of Baltimore; for the mayor, in his first public utterance, had declared such to be his unalterable purpose. The services were claimed to be valuable because of the plaintiff's peculiar ability to influence a sale by the city by reason of his acquaintance with the social and political friends of the mayor; but the alleged social and political friend, when called as a witness by the plaintiff, testified that he declined to enter into any arrangement with the plaintiff, because he did not care to have anything to do with him, and the mayor testified that he positively refused to permit a sale of the road to any one with whom the plaintiff was associated, because he feared lest, on account of Mr. Lauterbach's ownership of an uncompleted road from Baltimore to Drum Point, the latter place should become the seaport terminus of the road. These facts are not controlling, because the defendant was at liberty to make a poor bargain; but they are entitled to consideration. Following the conversations testified to as above stated, the plaintiff from time to time over a period of three or four months furnished information and data concerning said road to the defendant, or his representative, Mr. Krech, and it is fairly inferable that this was done for the purpose of informing the defendant about the road and thereby persuading him to take an interest in the plaintiff's scheme. The plaintiff sought to make it appear that this information was of a confidential nature, collected by him at large expense and labor, and doubtless the jury were impressed by the mass of exhibits, covering many pages of this record, which upon examination are found to consist mainly of statutes of the state of Maryland, ordinances of the city of Baltimore, and public reports of the road, to which reports were annexed the reports of Accountant Little, the accountant of the road, containing the exact data which the plaintiff claims to have employed the said Little to obtain and furnish to the plaintiff. During this same interval the plaintiff was endeavoring, through the aid and in the name of Mr. Lauterbach, to purchase the road from the city of Baltimore, and the letter written by the latter to said Little within a week after the alleged conversations with the defendant is significant. I quote:

"I am endeavoring to effect the purchase of all the securities of the Western Maryland Railroad Company owned by the city of Baltimore and

an assignment of its claims against the railroad. When I shall have accomplished this purchase, I propose to institute proceedings for the reorganization of the company. In all these matters I desire to secure your co-operation and to have the full benefit of your services."

These efforts to acquire the road before the defendant had even decided whether he would become interested tend strongly to support the inference that they were made on behalf of the plaintiff, instead of the defendant, in the hope that the defendant might ultimately decide to finance the scheme, and, in the event of his refusal, that some one else might be induced so to do; and in fact, after the defendant notified the plaintiff, about May, 1901, that he would not undertake it, the plaintiff unsuccessfully undertook to interest the firm of J. P. Morgan & Co. It is true the plaintiff testified that the defendant said that he would not go into it unless the plaintiff could satisfy him that he (the plaintiff) could get the road; but, if this be true, the plaintiff failed to meet the condition imposed by the defendant, because his effort to purchase the road failed, and his offer was rejected. In the language of the mayor, he "turned it down." Thus, as early as May or June, his negotiations with the city and the defendant had resulted in a refusal of the city to sell to him and a refusal of the defendant to become interested with him.

In December, 1901, more than six months after said failure of the plaintiff, one Edward L. Fuller purchased the stock of the West Virginia Central, with the idea, as he says, of either extending it to Baltimore or of acquiring the Western Maryland and connecting the two by building 65 miles of road. Fuller was a total stranger to the defendant. In January, 1902, said West Virginia Central stock was taken over by the so-called "Fuller Syndicate," in which the defendant is not claimed to have had any interest. On March 6, 1902, the city of Baltimore advertised in Baltimore, Chicago, and New York for sealed bids for its interest in the Western Maryland, and on the 17th of March, 1902, said Fuller, Myron T. Herrick, and Winslow D. Pierce submitted a bid, which on May 7th was accepted. Said Pierce was the counsel of Mr. Gould, to whom the defendant the year before, at the suggestion of Mr. Lauterbach, had submitted the plaintiff's papers relative to said Western Maryland; but Pierce testifies that the proposition was brought to him by Fuller, and that he only consulted Mr. Gould to the extent of obtaining his consent that he go into it with Fuller, and Fuller testifies that he obtained all his information relative to the road from Mr. Hood, its president. Subsequent to the bid of March 17th a new syndicate, called the "West Virginia Central and Western Maryland," was formed to take over the holdings of the Fuller syndicate, to acquire the Western Maryland if the bid was accepted, to extend the West Virginia Central from Cumberland to Pittsburg, and to connect it with the Western Maryland, thereby furnishing the Wabash System an outlet to tide water; the scheme being to issue stock and bonds to the amount of $60,000,000, respectively, based upon said two roads, with said extensions and certain coal properties that were acquired with the West Virginia Central. After the formation of said latter syndicate, said Pierce and Herrick in its behalf applied to the defendant, through Mr. Krech, for a loan from the Mercantile Trust Com-

pany, of which the defendant was president and said Krech vice president, which was refused. Thereafter Mr. Gould, Mr. Krech, the defendant, and many others prominent in the financial world, became subscribers to the West Virginia Central and Western Maryland Syndicate, the subscription of the defendant being for $200,000, one-half of which he sold at cost, and thereafter Mr. Krech, as one of the syndicate managers, assisted in the physical transfer of the securities held by the city of Baltimore. The plaintiff now claims that the scheme finally consummated was his idea at the start, that the defendant's refusal to go on with him was made in bad faith, and that in fact the defendant, taking advantage of the information imparted to him, caused the formation of said syndicates and the purchase of said road, and that his subscription of $100,000 makes him liable on his contract to pay the plaintiff $1,000,000. There is no evidence whatever, unless it can be inferred that, after his refusal to go on with the plaintiff in May, 1901, the defendant had anything to do with the matter, knew anything about it, or imparted any information in reference to it to any one up to the time that he was applied to for a loan after the successful bid was made; and both he and the parties engaged in the enterprise testified that he had had nothing to do with it, directly or indirectly, prior to said time.

Assuming that the evidence presented a question for the jury, and that we would not be warranted in disturbing their verdict upon the facts, there is yet in my judgment an unsurmountable obstacle to the affirmance of this judgment. I take it we must agree that the defendant was entitled to have the cause of action declared upon by the plaintiff submitted to the jury. I quote from the charge:

"The two prominent questions which you will be called upon to consider are these: First, was there an agreement made between the plaintiff and the defendant, such as the plaintiff contends, and, if so, had the defendant broken that agreement? * * * The contract, as the plaintiff contends, was that, if the defendant did not go on with it, then he should not go on with any one, but that the knowledge and information that he had acquired would be still in his own breast, and that he would take no part or have nothing to do with any organization or syndicate or combination that would enter into that purchase. It was, as you see, the only way in which the plaintiff might safeguard his rights. He had to rely upon the defendant. It was a matter in which he had to trust him entirely. * * * He produces another witness, Katz, who accompanied him at that time, and who also details to you the conversation that took place then between the plaintiff, as he says, and the defendant, and they are in substantial accord as to what was agreed at that time. * * * Then Mr. Lauterbach tells you that he was careful to exact from the defendant a promise that, unless he went on with the plaintiff in regard to this matter, he would not go into it with any one in any shape whatever, or words to that effect. That is the substance of it. * * * If you find that such a contract existed, then you come to the further question of fact, and that is whether the defendant, by entering into this Fuller syndicate, broke that agreement. * * * It was not a contract that could be expected to extend indefinitely, but for a reasonable period thereafter he was bound to abstain from entering into any enterprise that was in conflict with this agreement which he had made with the plaintiff. * * * If there was no connection between this contract which the defendant made with the plaintiff and the subsequent purchase made by the Fuller syndicate, then you are at liberty to say that there was no breach of that agreement. * * * Certainly, if such an agreement was made by the defendant, and in entering into this Fuller syndicate in the purchase of the property he violated that agreement, you should not hesitate to give the

plaintiff a verdict for the amount to which he is entitled. * * * Your
anxiety only can be to know what the contract was, and to know whether it
has been kept or whether it has been violated. If the defendant made such
a contract, and his acts in entering into the syndicate and the purchase of
that property were in violation of that contract, then he cannot ask you to
absolve him from the obligation of his contract."

And it is said that this charge, considered in its entirety, followed
closely the allegations of the complaint. I confess that after the most
careful scrutiny I have been unable to detect the slightest resemblance
between the cause of action submitted and the one alleged. It certainly
will not be claimed that a cause of action on contract to recover a stipu-
lated sum is the same as an action to recover damages for breach of con-
tract. They are both dissimilar and inconsistent. One rests upon per-
formance; the other, nonperformance. The recovery in one is meas-
ured by the agreement; in the other, by the damages proven. It will
not do to say, as the trial court subsequently said, that the breach re-
ferred to the refusal to pay the sum stipulated, because the court re-
peatedly defined the breach as being the act of the defendant in enter-
ing the Fuller syndicate. The contrast between the cause of action
pleaded and the one submitted is as marked as the contrast between the
plaintiff's version of the conversation with the defendant and Katz's
version of the same conversation. The learned trial court was doubt-
less impressed that the testimony of Katz and Lauterbach, with the
other testimony in the case, established, if any, a cause of action for
breach of contract, and in effect told the jury that if they believed Katz
and Lauterbach, and found that there was any connection between the
transaction of the plaintiff with the defendant and the transaction re-
sulting in the actual purchase of the road, they should give the plaintiff
$1,000,000 damages; and in my judgment the jury rendered its verdict
upon that theory. If we could ignore the well-settled and salutary
rule, necessary for the protection of the substantial rights of litigants,
that the judgment must be secundum allegata et probata, we should be
confronted with the difficulty that the cause of action upon which this
verdict was rendered was neither alleged nor proved, but the jury were
required to fix the damages resulting from the alleged breach of con-
tract at $1,000,000, without there having been even an attempt to prove
damages.

This manner of submitting the case was clearly excepted to, and an
exception was taken to the refusal of the court to charge that the plain-
tiff could not recover damages for breach of contract in this action.
Thereafter the following request was made by the defendant's counsel,
viz.:

"The jury must find a verdict for the defendant, even if they find Gen.
Fitzgerald made the promise alleged, if they find Gen. Fitzgerald in good
faith withdrew from the attempt to purchase the securities without any in-
tention on Gen. Fitzgerald's part to proceed otherwise, or with other parties
to the purchase of the securities, and if in fact the jury find that Gen.
Fitzgerald made no attempt to purchase or promote the purchase of the
securities."

In my opinion the defendant was entitled to have this request charged,
and it was important, in view of the evidence tending to prove that the
defendant had nothing to do with the purchase from the city of Balti-

more; but it may fairly be said that the court had covered the point in the main charge, although not in the precise form requested. The court's attention at this point had been called to the error pervading the main charge. Nevertheless, in response to this request, that error was repeated and emphasized as follows:

"The Court: The contract was, if there was any contract at all, that he should not unite with any one in the purchase, or that in substance. I thought that when you drew that request you did not appreciate the point. Outside of that, I charge what is there.

"Defendant's Counsel:   I except to your honor's modification of the charge and to the charge as made."

This statement, as applied to the request, made the defendant liable for breach of contract by reason of his subscription to the syndicate agreement, irrespective of whether there was any connection between the contract with the plaintiff and the subsequent purchase by the Fuller syndicate, and therefore not only repeated the error in respect to misstating the nature of the cause of action, but tended to nullify the portion of the main charge in which the court had told the jury that it was necessary there should be such connection to enable the plaintiff to recover.   I think this exception presents reversible error.

But it is claimed that these errors were cured by the colloquy which subsequently occurred, as follows:

"The Court:  This is an action upon the contract for breach of the contract, the agreement being that he would pay him $1,000,000 if he went with somebody else; and they claim that he did go in with somebody else, and he has not paid the $1,000,000.

"Defendant's Counsel:  I except to your honor's remarks, and also to your honor's statement that this is an action for breach of the contract.

"The Court:  In the sense that he has not paid the $1,000,000.

"Defendant's Counsel:  I except to your honor's refusal to charge.

"The Court:  The distinction should be made clear.  Perhaps, gentlemen of the jury, in view of this request, I ought to make it a little clearer.  The plaintiff's contention is that the defendant made this agreement that he would pay $1,000,000 if he went in with any one else in the purchase of the property; and the plaintiff also claims that when he went into the Fuller syndicate he did go in with somebody else, and therefore became indebted to him in the sum of $1,000,000.  That is a more correct statement of the issue here than the one I gave you in the principal charge.

"Defendant's Counsel:  I except to your honor's statement."

The learned court evidently appreciated at this point the error of the main charge, but can we say that error was cured? I think we would all say, as the result of our observations at the bar and while holding Trial Term, that the jury get their impression of the issues from the charge in chief, and that the colloquy between court and counsel respecting requests to charge serves more frequently to present pitfalls to the judge than to enlighten the jury. Of course, distinct statements which can be dissociated from the rest of the charge may be corrected in such manner as to cure any error; but here the charge was based upon the wrong theory of the cause of action and in its entire scope was radically wrong. The error pervaded almost every statement of the court, and, assuming that the jury got the force of the last statement as quoted above, can we say that they were able to dissociate the errors in the charge from the statements with which they were connected, so as to understand such statements, thus relieved of the false

coloring of the associated error? The court by iteration and reiteration had impressed upon the minds of the jury that, if they found that by entering the Fuller syndicate the defendant had broken the agreement testified to by Katz and Lauterbach, they were to give the plaintiff a verdict of $1,000,000. (In using the words "Fuller Syndicate" the court evidently meant, and was understood to mean, the West Virginia Central and Western Maryland syndicate, as the defendant was concededly not a member of the Fuller syndicate.) And yet we are asked to say that by restating the plaintiff's contention in a single sentence, in the midst of colloquy with counsel during the making of requests to charge, and then adding the statement that "that is a more correct statement of the issue," the wrong impression created by the main charge, covering seven pages of this record, can be entirely removed. Merely saying that a different statement was "clearer" and "more correct" did not apprise the jury that the main charge was wrong; much less in what respect it was wrong. In my judgment such error as pervades this charge could be cured, if at all, only by stating plainly to the jury that the entire charge as made was wrong and should be disregarded, and then by stating the issues as they should have been originally charged. Unless we are prepared to say that this single sentence obliterated the charge in chief and became the charge of the court, we should reverse this judgment; and if we say that, the respondent is in no better position. I repeat the statement:

"The plaintiff's contention is that the defendant made this agreement that he would pay $1,000,000 if he went in with any one else in the purchase of the property, and the plaintiff also claims that when he went into the Fuller syndicate [evidently meaning the West Virginia Central and Western Maryland], he did go in with somebody else, and therefore became indebted to him in the sum of $1,000,000."

The court simply states this as the claim of the plaintiff; but, if it is to have the effect claimed, it must be regarded as a direction to the jury to find for the plaintiff in case they find that the agreement was as stated, because concededly the defendant did go into said syndicate, which, of course, was "going in with somebody else." This statement was excepted to, and was clearly erroneous, in that it entirely eliminated the question whether there was any connection between the transaction with the defendant and the purchase of the road by the syndicate of which he afterwards became a member. It will not do to say that this was not called to the attention of the court at this point, because it had just before been called to its attention by a proper request that had been refused. Neither will it do to say that the jury were not misled, because, if it was sufficiently impressive to obliterate from their minds the wrong impressions previously created, it obviously must have misled the jury and sent them out with the impression that they had only a single question with which to deal, to wit, whether the agreement claimed by the plaintiff was made. In my judgment the jury were misled by this charge in respect to a vital point in the case, but this discussion must demonstrate that it is at least a matter of speculation whether they were, and where conceded error has been committed,

which we cannot say was harmless, it is our duty to grant a new trial. I therefore vote for a reversal of the judgment.

Judgment and order reversed, and new trial granted; costs to abide the event.

WOODWARD and JENKS, JJ., concur.

RICH, J. (dissenting). The defendant has taken this appeal from a judgment against him, rendered upon the verdict of a jury for $1,112,510.71. The plaintiff is a promoter, and his recovery was for services alleged to have been rendered defendant and information imparted to him in connection with the sale of the Western Maryland Railroad. He claims that defendant promised to pay him for information that he possessed regarding the railroad and for his services in obtaining data as to its earning capacity, etc., $1,000,000. When the learned counsel for appellant disclosed the nature of this controversy and the extraordinary contract alleged by plaintiff to have been made, we had grave suspicions as to the justice of his claim. It is disclosed upon a careful examination of the record that the city of Baltimore was a creditor of the Western Maryland Railroad to the extent of several millions of dollars, had secured through legislative enactment control of its board of directors, and was practically the owner of the road, which ran from the city of Baltimore westerly to Cherry Run, a distance of about 90 miles, and in addition to this the road controlled about 200 miles of leased lines. The plaintiff, prior to the year 1900, had resided in the city of Baltimore, was acquainted with some of the municipal authorities, and knew of the public sentiment in favor of a sale of the road. Through his acquaintances, who were social and political friends of the mayor of the city, he became conversant with the latter's determination to sell the interests of the city in the railroad. He had knowledge of the further fact that the mayor would not consent to its sale to either the Pennsylvania or Reading Companies. He also knew that the Wabash Railroad System, then controlled by the Goulds, and running to Pittsburg, was anxious to obtain an Eastern connection to tide water, which could be effected by uniting with the Wabash System the West Virginia Central and Pittsburg and Western Maryland Railroads, by constructing about 65 miles of new road, and that, with this connection and its possibilities and excellent construction, was a very valuable property, and could be acquired for much less than its actual value. He came to New York in December, 1900, with the apparent determination of securing the ownership and control of this road, through syndicate organization or otherwise. He applied to the defendant, who was the president of the Mercantile Trust Company and a business associate of the Goulds, for aid. Upon the trial he testified to several interviews with defendant, as follows:

"Beginning with my first interview, I said: 'Gen. Fitzgerald, I know of a railroad about 90 miles long, controlling about 200 miles of leased lines;' that the road was earning about $800,000, net. It was a most valuable railroad. This is what I said to Gen. Fitzgerald. The bonds—the principal and interest—were vested in the hands of one or two parties, and the principal and interest were in default for a number of years, and we could buy a rail-

road cheap; a railroad worth from about five or six to ten millions. I said: 'General, it is one of the best propositions I ever heard of in my life.' I said to him: 'Would you entertain a railroad proposition of that kind?' He said: 'I am always willing to entertain any good railroad proposition, and glad to see you with your papers in connection with it.' He wanted to know where the railroad was. I told him not far from New York; that we did not have to go to Nebraska or Dakota. He said: 'Bring in your papers when you are ready.' A few days afterwards I had some more interviews with him, and told him I had seen a great many people in connection with the road, and they told me the road was worth from twenty to twenty-five million. The president of the road said that the road was worth fifteen to twenty million. The general said. 'Well, I have not got the time now. Bring in your papers. It seems to be a very good thing. Bring in your papers.' I had several interviews with Gen. Fitzgerald about underwriting the bonds and furnishing the money to pay for defaulted securities and underwriting a new issue of bonds. I went and got some more papers, and came back to Gen. Fitzgerald, and I said: 'General, I have papers now that I can submit in reference to that railroad proposition,' not mentioning the name. I said: 'General, now it is time to come down to business, and I would like to have you underwrite these bonds.' He said: 'To what extent?' Says I: 'About $10,000,000 will cover it—the cost of the road. There is a million dollars in it for you.' After thinking it over, he said: 'I don't care about underwriting bonds. If it is such a good thing, I may want to buy it myself, or form a syndicate. The only way I will entertain the proposition is: You name a price that you want for your services and information, and then I will investigate.' Said I: 'General, I offered you just now $1,000,000 to underwrite these bonds to furnish me the money to pay for these securities. Now, I never offer anything, unless I am willing to take the same medicine. I will take $1,000,000 paid to me on the acquisition of these securities or the control of the road.' He says: 'All right. A million dollars is a good deal of money.' Says I: 'General, you are not bound to take it up if you don't want to take it up. Drop it right there, and I will sell it to some one else, after your investigation.' He said: 'Well, leave your papers.' Said I: 'General, I want a more distinct understanding with you about these papers. I can't get an option on that railroad or on these securities. It is impossible for me to get an option. I am not doubting your integrity at all; but I want it understood that if I leave with you these papers, or disclose the name of this railroad, I shall receive $1,000,000 from you when you acquire the securities or purchase the road, or any company that you might form, or any syndicate that you might form or become interested in—either one, company or syndicate—I shall receive $1,000,000 for my services and information to you. I shall have to spend a great deal of time to aid you in the investigation.' Gen. Fitzgerald said: 'Leave your papers.' I am a little ahead of my story. I said: 'General, I am only protecting myself. I don't want you to go into it with any other company or body of men, because your name is a tower of strength.' He says: 'You needn't be afraid. If I don't go into it with you, I won't go into it with anybody else, unless I pay you the $1,000,000.' Thereupon I gave him the name of the railroad and the régime of the road, showing the city's interest, stating that the city of Baltimore owned the railroad and had a majority of the directors, 8 out of 13, and showed him the earnings. A few days afterwards I came back and I said: 'General, I have engaged a man, who is acting as my attorney in this matter, and perhaps he can give you very valuable assistance.' He says: 'Who is he?' I said: 'Edward Lauterbach, a man that I know you have confidence in.' Says he: 'Will you make an appointment with Mr. Lauterbach? Tell him I would like to see him.' I went to Mr. Lauterbach's office, and told him that Gen. Fitzgerald wanted to see him; that I thought I had succeeded in interesting him in making an investigation into the railroad. * * * A couple of weeks after that I went in to Gen. Fitzgerald, and I said: 'General, this is Mr. Little, an expert accountant, that I have engaged to help me in railroad matters. There is a $25,000 expert. You see I don't get the whole million. I have got to pay a part out at least,' and I introduced Mr. Little and Gen. Fitzgerald. [This conversation is also testified to by Mr. Little, and not denied by the defendant.]

On one of these occasions I was referred to Mr. Krech. After I left my papers, before he told me he wanted to see Mr. Lauterbach, he says: 'By the by, if you have any more papers to leave, I wish you would leave them with Mr. Krech. I have not time to investigate this thing. You tell me there is a big mass of papers. I wish you would give them to Mr. Krech.' I said: 'Who is Mr. Krech?' He says: 'He is vice president of the Mercantile Trust Company, who makes my investigations for me.' Says I. 'I would like to know who he is and where I can find him.' He says: 'He is a man you can rely upon just as you can rely upon me. Whatever he does he is doing for me, in investigating the matter.' Subsequent to that I handed papers concerning information about this road to Mr. Krech, for three or four months; handed him papers and information—maps. These investigations went along some time."

Mr. Lauterbach testified:

"I called on Gen. Fitzgerald at his office in the Mercantile Trust Company, and told him that Mr. Mengis had requested me to call upon him at his—as I understand it, at his (Gen. Fitzgerald's)—request. The general said that that was correct; that Mr. Mengis had called upon him in reference to a railroad matter, and had told him that I represented him, and that he would be glad to see me, and that he was glad that I had come. I then stated to him that I had been examining the matter with great care for some weeks, and that I was convinced that a purchase of the securities held by the city of Baltimore of the Western Maryland Railroad Company would be a most advantageous purchase, and that I was of the impression that the securities held by the city of Baltimore could be acquired, owing to the attitude that had been publicly assumed by the mayor; that I had investigated the condition of affairs, the status of the road, with some care; and that I believed that the purchase would be a profitable one. I went over some of the features of the enterprise. I spoke of the franchises that were controlled by the Western Maryland Railroad Company that would bring it to tide water through the city of Baltimore. I told him that I thought it was possible that the burden of a contract under which the Western Maryland Railroad Company entered the city through the tunnel could probably be avoided; I thought that, if the railroad made connections with other systems, it would be of great advantage; * * * that in my opinion the road could be capitalized at a very much larger sum than its then capitalization, and that it would be a dividend paying road upon a very largely increased capitalization; and I spoke very favorably of the enterprise. I said that I had gone over the matter with Mr. Little, in whom I had very great confidence, who was thoroughly familiar with the present status of the road, and that he had been sanguine in his statements concerning it without regard to the development of the road which it was susceptible of, and that that in proper hands I thought it would be a brilliant investment. Mr. Fitzgerald said he was very much obliged to me for calling, that the matter was of interest to him, and then said that Mr. Krech would go on with the matter for him, and that I should give Mr. Krech the fullest information that I could, and continue to assist him in the investigation of the matter, which I agreed to do. I then said to the general: 'General, if you don't do this transaction through Mr. Mengis, I want to exact a promise from you that you will not do it at all, either directly or indirectly.' Said he: 'Of course not. If I don't take the property through Mr. Mengis, I won't take any interest in it at all.' I then saw Mr. Krech, at his suggestion. Either at that time, or the second interview—I am not sure which, but at an early part of the transaction—the general said to me: 'Mr. Mengis' requirements in this matter are very large—exceedingly large.' I think he mentioned the sum, but I am not sure. I don't know that the sum of $1,000,000 was mentioned. And I said that that was true, but that the property was a very valuable one, the profits in its acquisition would be very large, and that the steps necessary to ascertain the situation of the property and its legal status, and the obtaining of the property from the city—the city's interest and the outlying interests, because some of the securities were held outside of the city, not a very lagre amount—would require a great deal of attention; that Mr. Mengis would be put to a very large

expense to Mr. Little and to experts and to lawyers, and that that ought to be taken into consideration; and that therefore I thought that Mr. Mengis was entitled to a very substantial benefaction. * * * I saw Mr. Krech on that day, and went over the matter again, and agreed to furnish him with any papers that he wanted, and stated to him that I would continue my investigation of the matter, so that, if the general determined to take the property, we would be in a position to know all the circumstances connected with it and to facilitate obtaining it from the city. He asked me to do so. I told him that Mr. Little had reported to me concerning the status of the property. I told him that I had examined many of the papers affecting it, that I was quite familiar with it, and went over the matter with him; talked with him about the valuable franchises which could be had, about the possibility of getting rid of the burden of payment of the rental for the use of the tunnel, and the great opportunities that would exist if the ownership of the road were in individual or corporate hands, and no longer in the hands of the city of Baltimore. I went into details fully with him, as fully as I had them, and then talked repeatedly about it, and gave him such papers as I could from time to time; arranged a meeting or two with him and Mr. Little, and Mr. Little made his statements to him in my presence; and I think sometimes —on one occasion only—I went there with Mr. Little, and, being busy, went away again; and called at Mr. Krech's office repeatedly, sometimes two or three times a week, sometimes telephoned him, to know what progress he was making, and, when he would ask for any additional information, would obtain it and hand it to him; and then, after the course of four or five weeks, he said he would examine the matter and required no further information; and then I would telephone him frequently, once a week, or twice a week, how he was getting along, and he would say that they were getting along and making the examination and proceeding with it, until about the month of May. * * * In about May, I think it was, I saw Mr. Krech, as I had frequently done, and he told me that they had concluded not to go on with the matter and that I should see Gen. Fitzgerald. I went in and saw Gen. Fitzgerald and spoke to him about it, and he said that they did not want to go on further under the arrangement with Mr. Mengis, and that they would drop the matter, and he asked me whether I would act as counsel for other parties, and that I would be liberally paid as counsel. I said that I could not assume that relation, because I had represented Mr. Mengis and could not represent any one else; and I then stated that I did not think that either he or I ought to have any interest in the matter with other people, except through Mr. Mengis. * * * During one of my conversations with Gen. Fitzgerald I made the suggestion of associating with him Mr. George J. Gould in the enterprise. I think I did that. I recall using the name of George J. Gould, very distinctly. I don't recall using the name, except as one having a possible interest in securing an Eastern connection for his Western roads, and that I knew of the intimacy between Gen. Fitzgerald and Mr. Gould, and thought that he would be an admirable associate to have in the matter, if he wanted one."

From the first interview in December, 1900, down to the time of this conversation in which the defendant declined to proceed further in the matter under the arrangement with the plaintiff, the latter and his expert employés and attorneys were engaged in obtaining information, consisting in part of reports of public officials, opinions of lawyers, industrial statistics, many of which were specially prepared and demonstrated the manner in which the earnings of the road could be greatly increased, as well as its status, earnings, and expenses, and maps showing the territory through which it passed and the lines with which it was connected, a synopsis of which fills over 100 pages of the record, and took several months to accumulate and prepare. He employed expert public accountants and lawyers in Baltimore and New York to aid him. The information thus acquired was imparted to Mr. Krech as defendant

directed, who submitted it to Mr. Gould in conformity with defendant's instructions. In the spring of the following year a syndicate was formed, of which Mr. George J. Gould and the defendant were members. They purchased the Western Maryland Railroad, and under their management it became a part of the Wabash System, which was thereby brought to tide water on the Atlantic. Mr. Krech was an active participant in the consummation of this result, and one of the two syndicate managers. He testifies that he did not become a syndicate subscriber or manager until he had obtained the consent of the defendant. It appears that he acquired all of his information concerning the road from the plaintiff, his counsel, and assistants, because he testifies that he had this information on July 1, 1901, and that after that date (when negotiations with the plaintiff were terminated), down to the time the road was purchased, he did not obtain any additional information of any kind concerning the road, its earnings, or value. Mr. George J. Gould (to whom Krech had submitted the papers and information he received through the plaintiff) had evidently acquired from such information a thorough understanding of conditions and values, for he subscribes $1,000,000 after a very brief conversation with his attorney, and the other members of the syndicate subscribed $15,000,000 without personal examination or statements made to them of matters connected with the road. The presumption is that their action was induced by knowledge acquired from the information plaintiff had procured and furnished to the defendant. The jury were justified in drawing this conclusion from the evidence before them. The defendant testified that he knew this road was for sale as early as the year 1892. The terms upon which it could have been purchased at that time, however, do not appear. He denied having made the agreement to which the plaintiff testified, and said he had no part in the formation of the syndicate and no knowledge of it, but admits that he became a member and subscribed $200,000, one-half of which he sold to the St. Louis Trust Company.

In determining whether the verdict of the jury is against the weight of the evidence, it is proper that we should take into consideration the business methods of the parties so far as they are disclosed by the record. Is it reasonable to expect that an agreement such as the plaintiff has testified to would be made by the defendant? He only undertook to pay in the event of his becoming interested in the purchase. After becoming possessed of the plaintiff's information, he had only to turn the project down to save himself from liability. He saw fit, however, to become a part of the syndicate which purchased the road for $8,751,370.45, and immediately following issued stock, now held by the syndicate members, for $60,000,000, and bonded the property they acquired (of which this railroad formed the larger and more valuable part) for a like amount, $50,000,000 of which was first and $10,000,000 second mortgage bonds, with the Mercantile Trust Company (of which the defendant was president and Krech vice president) as trustees. At the time of the trial these bonds were selling in the market at between 86 and 89 per cent. of their par value. There was nothing disclosed to justify this great capitalization, but it enlightens us as to the manner

95 N.Y.S.—29

in which the members of this syndicate do business, and indicates that they were in the transaction for the money. It illustrates the ease with which the burden of paying interest charges and dividends upon such an overcapitalization may be placed upon the shippers and the traveling public. Is it reasonable to suppose that the agreement to pay the plaintiff the sum he claims was made? The jury have answered in the affirmative. Viewed in the light afforded by these facts, the alleged agreement to pay the plaintiff $1,000,000 is relieved of the suspicions we entertained at the opening of the case. We cannot say, therefore, that the verdict is against the weight of the evidence. On the contrary, we think it is amply supported by it. It is true that, judged by the standard of men who earn their money, the plaintiff did not earn $1,000,000; but it is not true, as stated by the learned counsel for the appellant, that he gets something for nothing. He employed able and experienced counsel, both in New York and Baltimore, to aid him, and became obligated to pay an expert accountant $25,000 for services in making an investigation into the affairs of the road. He was entitled to $1,000,000 or nothing, and the defendant cannot be permitted to avail himself of the fruits of the purchase and escape liability to the plaintiff for his agreed compensation, even if it be conceded that his contention that the agreement was preposterous is well founded.

In view of the large amount of the recovery, we have carefully examined the questions presented by the 28 exceptions taken by the appellant's attorneys to the rulings of the learned trial justice during the progress of the trial, and find no error prejudicial to the defendant. The charge relating to the agreement, considered in its entirety, followed very closely the allegations of the complaint, and we are unable to agree with the suggestion that the court presented to the jury a different issue from the one raised by the pleadings. If the agreement alleged in the complaint was made, it was broken beyond question; for the defendant admits that he was interested as a member of the syndicate that acquired the road, and the court expressly stated that the breach of contract to which it referred was the defendant's failure to pay the million dollars.

The issues were fairly and impartially presented to the jury in a charge free from error, and the judgment and order appealed from must be affirmed, with costs.

HIRSCHBERG, P. J., concurs.